JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant Howard Clay appeals his felonious assault and having weapons while under disability convictions. For the reasons that follow, we affirm.
 {¶ 2} Appellant was indicted on April 6, 2006, on two counts of felonious assault and one count of having weapons while under disability. Both felonious assault charges carried one-and three-year firearm specifications. The date of the offense was March 5, 2006. The alleged disability was that, at the time of the instant offense, appellant was under indictment in case number CR-468990 for a drug offense. *Page 2 
 {¶ 3} After appellant waived his right to a jury trial, the case proceeded to trial before the court. At the conclusion of the State's case, the defense made a Crim.R. 29 motion for acquittal on the having a weapon while under a disability count. Counsel conceded that appellant had been indicted on August 4, 2005 on drug charges, but argued that the State did not present any evidence that appellant had notice of the indictment prior to the alleged use of the firearm in this case. The court overruled appellant's motion. Appellant was found guilty of all counts and specifications and sentenced to eight years.
 {¶ 4} At trial, the victim, Christopher Graham, testified that just before midnight on March 5, 2006, he and some friends went to the Gin-Gin bar in Cleveland. One of the friends he was with was Charday Elmore. Graham testified that while at the bar, he had two beers and/or some Hennessy. At approximately 1:00 a.m., Graham and Elmore left the bar with a man named Ken, intending to go downtown.
 {¶ 5} Elmore was their driver and got in the driver's seat of the car in which they were traveling. Graham got in the backseat.[1] According to Graham, before he closed the door, an individual approached him, said "hey, my dude," pulled out a gun, and shot him in his right thigh for no apparent reason. He further testified that *Page 3 
after the shooter shot him, the shooter walked around the car and fired another shot at the car window. Graham testified that he did not know the shooter and had never seen him before.
 {¶ 6} Elmore testified that as he was entering his vehicle and starting the engine, he heard two gunshots. He then heard Graham say that he had been shot. Elmore testified that appellant, who he knew from the neighborhood, then approached the driver side of the car and shot at his window. Elmore testified that he only knew appellant's first name, "Howard," and told the police his name when they arrived on the scene. The police report, however, refers to the suspect as "name unknown."
 {¶ 7} The investigating detective, Larry Russell, testified that no gun was recovered, but Elmore's window was shattered and there was a hole in the back seat. Although Graham testified that drugs were not regularly sold around the area and denied that he sells drugs, Detective Russell described the area around the Gin-Gin bar as plagued with significant drug activity. Graham admitted that he was arrested on four occasions between 2002 and 2005 for drug offenses and pled guilty in at least two of the cases.
 {¶ 8} Two days after the shooting, Elmore visited Graham in the hospital. According to Graham, Elmore told him that a person named "Howard" shot him. *Page 4 
Elmore, however, denied telling Graham the name of the shooter and said that he did not discuss the case with Graham at all during the visit.
 {¶ 9} Detective Russell spoke with Graham a few days later and Graham told him that Elmore had identified "Howard" as the shooter. Detective Russell testified that he confirmed with Elmore that the shooter's name was "Howard," as well as the fact that Elmore did not know "Howard's" last name.
 {¶ 10} Detective Russell explained that he ran the name "Howard" through the police's computer system and stopped his search when he found "Howard Clay," because "Howard Clay" lived four blocks from the Gin-Gin bar. He then put together a photo array, which included appellant. The detective admitted that he also found several other people named "Howard" who lived in the area.
 {¶ 11} Graham testified that upon being shown the photo array, he picked appellant "[a]lmost instantly." He testified that he saw the shooter's face for only seven seconds, but nevertheless got a good look at him. He described the shooter as bald, with a goatee, and as being "dirty and raggedly looking." Graham also said the shooter was wearing a hoodie and coat. He explained that, despite the hoodie, he could see that the shooter was bald because the hoodie covered only half of his head. Graham also identified appellant in court as the shooter.
 {¶ 12} Elmore also identified appellant in court as the shooter. Elmore described that, at the time of the shooting, appellant was wearing a blue hoodie that *Page 5 
was "all the way up" and blue jeans. Elmore testified that he got a good look at appellant after the second shot was fired. According to Elmore, appellant was the "neighborhood crackhead."
 {¶ 13} After being arrested, appellant initially denied any knowledge of the incident, but later gave a written statement indicating that he was there, but did not shoot anybody, and did not know the shooter.
 {¶ 14} In his first and second assignments of error, appellant contends that the State did not present sufficient evidence to sustain his having weapons while under disability conviction and the trial court misapplied the law in convicting him of the charge, respectively. In particular, he argues that although the State offered a copy of his August 4, 2005 indictment for a drug offense, it never presented any evidence that appellant was aware of the indictment.
 {¶ 15} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259,574 N.E.2d 492, paragraph two of the syllabus, following Jackson v.Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. Under this standard, an appellate court does not conduct an exhaustive review of the record, or a comparative weighing of competing evidence, or speculation as to the credibility of *Page 6 
any witnesses. Instead, the appellate court presumptively "view[s] the evidence in a light most favorable to the prosecution." Id. "The weight to be given the evidence and the credibility of witnesses are primarily for the trier of the facts." State v. DeHass (1967), 10 Ohio St.2d 230,227 N.E.2d 212, paragraph one of the syllabus.
 {¶ 16} R.C. 2923.13, governing having weapons while under disability, provides:
 {¶ 17} "(A) Unless relieved from disability * * * no person shall knowingly acquire, have, carry or use any firearm or dangerous ordnance, if any of the following apply:
 {¶ 18} "* * *
 {¶ 19} "(3) The person is under indictment for or has been convicted of any offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse * * *."
 {¶ 20} Appellant acknowledges in his brief that this court, inState v. Gaines (June 10, 1993), Cuyahoga App. Nos. 62756 62757, held that a defendant does not have to have notice of his disability status for a having weapons while under disability conviction to stand. InGaines, the defendant was arrested after an execution of a search warrant on January 22, 1991. The defendant was subsequently indicted in case number CR-262862 for drug abuse, possession of criminal tools and having weapons while under disability. This court noted that *Page 7 
"[d]efendant was not present at the arraignment, apparently because the notices were never received by defendant." Id. at 2. On July 8, 1991, the defendant was arrested on his outstanding warrant. During a search of his hotel room, the police found a gun. The defendant was subsequently indicted for having weapons while under disability in case number CR-269492. In addressing the defendant's claim that his conviction for having a weapon while under a disability could not stand because he was unaware of the indictment, this court stated that "R.C.2923.13 only requires that defendant be under indictment, not that defendant have knowledge of the indictment." Id. at 9.
 {¶ 21} We are aware that the Sixth Appellate District held that the State must prove that the defendant had knowledge of the indictment which served to create the disability under R.C. 2923.13. State v.Burks (June 22, 1990), Sandusky App. No. S-89-13. While we are clearly in conflict with the Sixth District, we are nonetheless constrained to follow our own precedent. Resolution of this conflict is not ours.
 {¶ 22} Appellant's first and second assignments of error are overruled.
 {¶ 23} In his third assignment of error, appellant contends that his convictions were against the manifest weight of the evidence.
 {¶ 24} Manifest weight is a question of fact. State v. Thompkins78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541. If the trial court's judgment is found to have been against the manifest weight of the evidence, then an appellate panel may *Page 8 
reverse the trial court. Id. at 387. Under this construct, the appellate court "sits as the `thirteenth juror' and disagrees with the jury's resolution of the conflicting testimony." Id.
 {¶ 25} In a manifest weight analysis, an appellate court "reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and * * * resolves conflicts in the evidence." Thompkins at 387. "A court reviewing questions of weight is not required to view the evidence in a light most favorable to the prosecution, but may consider and weigh all of the evidence produced at trial." Id. at 390 (Cook, J., concurring). An appellate court may not merely substitute its view for that of the jury, but must find that "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id. at 387. See, also, id. at 390 (Cook, J., concurring) (stating that the "special deference given in a manifest-weight review attaches to the conclusion reached by the trier of fact."). Accordingly, reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." Id. at 387.
 {¶ 26} Appellant argues that the State's witnesses gave inconsistent descriptions of the assailant, and those inconsistencies render his convictions against the manifest weight of the evidence. Graham described the shooter as bald, with a goatee and as being "dirty and raggedly looking." Graham also said the *Page 9 
shooter was wearing a hoodie and coat. He explained that, despite the hoodie, he could see that the shooter was bald because the hoody covered only half of his head.
 {¶ 27} Elmore described that, at the time of the shooting, appellant was wearing a blue hoodie that was "all the way up" and blue jeans. Elmore testified that he got a good look at the shooter after the second shot was fired. According to Elmore, appellant was the "neighborhood crackhead."
 {¶ 28} We do not find those descriptions to be so inconsistent as to render the convictions against the manifest weight of the evidence. Further, both Graham and Elmore identified appellant in court as the shooter. Moreover, the court heard the supposed inconsistent descriptions of appellant, and was free to give credence to some, all, or none of them.
 {¶ 29} Similarly, the court heard the other inconsistencies in the testimony (i.e., whether Graham and Elmore had a discussion at the hospital about the identity of the shooter, and whether Elmore told the police at the scene that the shooter was "Howard") and was free to give credence, or not, to whatever portions of the testimony, if any, it found credible. Those inconsistencies do not render appellant's conviction against the manifest weight of the evidence. *Page 10 
 {¶ 30} We are also not persuaded by appellant's argument that Graham and Elmore colluded to "pin" this crime on appellant because he was allegedly homeless. There is no evidence in the record to support that allegation.
 {¶ 31} Appellant's third assignment of error is overruled.
Affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
MARY J. BOYLE, J. CONCURS
PATRICIA A. BLACKMON, J., CONCURS IN JUDGMENT ONLY
[1] Graham testified that he was seated on the passenger side of the car, while Elmore testified that Graham was seated on the driver side of the car. The record is also not clear about where Ken was. *Page 1